IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

REBECCA A. ISON,                          :

    Plaintiff,                        :

                                        Case No. 3:06cv277

      vs.                           :

                                    JUDGE WALTER HERBERT RICE

GADE NURSING HOME, INC., *et al.*,        :

    Defendants.                       :

---

OPINION; FINDINGS OF FACT AND CONCLUSIONS OF LAW SET
FORTH; JUDGMENT TO ENTER IN FAVOR OF PLAINTIFF AND
AGAINST DEFENDANTS; TERMINATION ENTRY

---

This litigation arises under the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiff Rebecca A. Ison was formerly

an employee of Defendant Gade Nursing Home, Inc. ("Gade"). Ison alleges that,

after terminating her, Gade, along with Defendants Martha E. Gade and Tim Gade,

wrongfully denied her the severance pay to which she was entitled under

Defendant Gade Nursing Home, Inc., VEBA Trust Severance Pay Plan. Doc. #34

(Am. Compl.).[1] She seeks to recover $57,058 in severance pay benefits, along

---

[1]The parties to this case previously filed Motions for Summary Judgment
(Docs. #42, #43) and responsive briefings thereto (Docs. #45, #46). The Court
overruled the Motions, as surplusage, but apprised the parties that it would
consider the arguments therein when ruling on the Plaintiff's claim (Doc. #47),

with attorney fees, interest and costs.

The Plaintiff alleges entitlement to such recovery under three alternative theories, to wit: (1) that Defendants' decision to deny her severance payment was arbitrary and capricious; (2) that Defendants violated 29 U.S.C. § 1140 by interfering with her right to collect such payment; and (3) that Defendants' decision to deny her benefits was due to bias and constituted a denial of due process. Id. at 11-12. The Court having concluded that Defendants' decision to deny her severance payment was arbitrary and capricious, as will be more fully explained below, it need not and does not address the alternative theories posed by the Plaintiff.

I. Findings of Fact

A. Identity of Governing Plan

1. Background Information as to Parties' Dispute on Identity of Governing Plan

In December 1997, Gade adopted the Gade Nursing Home, Inc., V.E.B.A. Trust Severance Pay Plan ("1997 Plan" or "Plan"). Doc. #41-4.[2] Tim Gade terminated Ison's employment, on October 11, 2005. Doc. #34 ¶7; Doc. 35 ¶7.

_____

which it has done, in arriving at its conclusions herein.

[2]The documents related to the 1997 Plan are contained in the record at Document #41-2, #41-3 and #41-4. These documents were entered into the administrative record pursuant to the Decision and Entry of this Court, dated September 27, 2007. Doc. #33 at 5-6.

On October 31, 2005, Ison submitted her application for severance pay benefits, in accordance with the provisions of this Plan. Doc. #13 at 14 (Bates #8313). On December 29, 2005, the Gade "Severance Pay Committee" informed Ison that her request had been denied, for reasons that will be more fully set forth below, and enclosed a page from the 1997 Plan that provided instructions as to how to appeal that denial. Doc. #14 at 22 (Bates #8354). In accordance with the referenced appeal provision, Ison submitted a timely request for appeal, dated February 20, 2006. Doc. #12 at 27-30 (Bates #8291-#8294). Under the terms of the Plan, the review Committee was required to issue a decision on the claim "no later than sixty (60) days after receipt of the review." Doc. #41-4 at 7. Nevertheless, the review Committee unilaterally extended that deadline for an additional sixty days, eventually issuing its final decision upholding the denial of severance pay benefits, on June 20, 2006. Doc. #9 at 1-3. The decision to maintain the denial of benefits hinged upon the Committee's interpretation of the allegedly relevant provisions of the 1997 Plan. See id.

On June 28, 2006, Gade informed its employees that it had amended the 1997 Plan "effective May 15" ("2006 Plan"), although it did not make copies of the new plan available to its employees until late July 2006. Doc. #25-2 (Williams Aff.) ¶¶ 2-7, Ex. A.[3] As to the execution of the 2006 Plan, the administrative

---

[3]This Affidavit was entered into the administrative record through Document #37 (which mistakenly indicates that said Affidavit is filed at Document #26, rather than Document #25-2), as approved by Notation Order, dated November 13, 2007.

record indicates that the final page is blank, whereon a "duly authorized officer" was to have executed the document to evidence Gade's agreement thereto. Doc. #15 at 22. There is attached, however, a document signed by the Gade Board of Directors that purports to have adopted the 2006 Plan, effective May 15, 2006. Id. at 23.

On both May 22 and June 2, 2006, the Defendants informed Ison that the administrative record in this case, as provided to Ison and which did not include the 2006 Plan, was complete. Doc. #9 at 6; Doc. #14 at 23-24 (Bates #8356-#8357). The Defendants subsequently supplemented the administrative record with a copy of the 2006 Plan, on October 22, 2006. Doc. #15.

## 2. Findings of Fact on Identity of Governing Plan

Ison argues that the governing plan is the 1997 Plan for the following reasons: (1) Gade denied Ison's claim for benefits (originally and upon review), based upon the terms of the 1997 Plan; (2) Gade informed Ison that the administrative record (which did not include a copy of the 2006 Plan) was complete, as late as June 2006, although it purportedly amended the Plan in May 2006; (3) Gade did not provide copies of the 2006 Plan to its employees until July 2006; and (4) Gade did not provide copies of the 2006 Plan to Ison until October 2006. The Defendants, on the other hand, contend that the governing plan is the 2006 Plan, asserting that that document became effective on May 15, 2006, and

the decision on Ison's appeal was not made until June 20, 2006.[4]

Based upon its review of the applicable evidence in the administrative record, as summarized above, the Court concludes that the governing document is the 1997 Plan, for all of the reasons cited by the Plaintiff. Whether or not Gade's Board of Directors actually adopted the 2006 Plan on May 15, 2006, Gade did not rely on this document when making its decision to deny Ison's request for benefits, either originally or upon review. Also, the Court finds the Defendants' argument to be disingenuous, given that Gade's decision on the appeal of Ison's denial was due in April 2006, under the terms of the 1997 Plan, but Gade unilaterally extended its decision making timeline for two months and then purportedly amended the Plan, in the meantime. In sum, then, the substantial evidence in the administrative record indicates that the 1997 Plan is the governing document, for purposes of determining Ison's eligibility for severance pay benefits.

B.    Plan Specifics

The Court will now set forth the parts of the 1997 Plan that are pertinent to the present litigation.

---

[4]Ison would be entitled to considerably less, in severance benefits, if the 2006 Plan governed her entitlements, rather than the 1997 Plan. Doc. #15 at 5. On another note, if the 2006 Plan governed the conclusions in this case, there would be a legal issue presented (i.e., if the 2006 Plan took effect on May 15, 2006, whether the 2006 Plan would govern the resolution of the issues presently before the court, given the timing of the other events that transpired in this case). The Court need not decide this issue, however, given its decision that the governing plan is the 1997 Plan.

- <u>Eligibility for Severance Pay Benefits</u>.  Severance pay benefits are payable to employees who are terminated for other than "cause", which is defined to include dishonesty, misconduct and insubordination. Doc. #41-2 at 2; Doc. #41-4 §§4.1-4.4.  Employees will normally receive severance benefits if "employment is terminated because of lack of work", if Gade ceases doing business or if the employee terminates his or her own employment. Doc. #41-2 at 2.

- <u>Amount of Severance Benefits</u>.  The amount of the benefit equals two times the employee's rolling annual base salary, multiplied by a percentage that is based on the employee's years of service.[5] Doc. #41-4 §§ 4.2, 4.3.

- <u>Determining Eligibility for Severance Benefits</u>.  The Severance Pay Committee ("Committee"), appointed by Gade's Board of Directors, is responsible for interpreting the Plan and resolving any disputes regarding eligibility under the Plan. Doc. #41-4 §§ 3.1, 5.1, 5.3.

- <u>Appeal Process</u>.  If the Committee denies a claim for severance benefits, the Plan provides the following process for the covered employee:  (1) request a review of the claim; (2) submit issues and comments in writing for consideration; (3) review "pertinent documents of the Plan"; and (4) request to meet with the Committee for the purpose of reviewing the claim. Doc. #41-4 § 5.2(b).  The Committee must render a decision on the reviewed claim no later than sixty days after receipt of the request for the same. Doc. #41-4 § 5.2(e).

- <u>Plan Contributions</u>.  All contributions to the Plan are made by Gade. Doc. #41-2 § 10.

As to the identity of the members of the Severance Pay Committee, Martha Gade

was the sole member, at the time the Committee originally denied Ison's claim for

---

[5]Ison's annual base salary for the twelve-month period prior to her termination was $34,791. Doc. #34 ¶ 17; Doc. #35 ¶ 17.  She was an employee for over thirteen years - - from March 20, 1992 to October 11, 2005. Doc. #34 ¶¶ 6-7; Doc. #35 ¶¶ 6-7.  The percentage allocated, under the Plan, to employees with between thirteen and fourteen years of service is 82%. Doc. #41-4 § 4.3. Thus, if Ison were due severance pay under the Plan, she would be entitled to $57,057 ($34,791 x 2 x 82%).

severance benefits. Doc. #14 at 22 (Bates #8354).  On February 27, 2006, Martha

Gade resigned and Tim Gade replaced her, as the sole member of that Committee.

Doc. #9 at 3; Doc. #34 ¶ 25; Doc. #35 ¶ 25.


      C.    <u>Ison's Termination</u>

           1.    <u>Background Information as to Parties' Dispute on Reasons for Ison's Termination</u>

Tim Gade terminated Ison on October 11, 2005. Doc. #34 ¶7; Doc. #35 ¶7.

As the following discussion will indicate, there is a disagreement between the

parties as to the reason for Ison's termination.

According to Ison's testimony, Tim Gade told her that he was terminating

her because of downsizing. Doc. #14 at 9 (Bates #8341).  In further support of this

contention, Ison points to her application for unemployment compensation, filled

out by the "employer", which indicates that Ison was terminated "due to Lack of

Work."[6] Doc. #34-4 at 3 (capitalization in original).  She also cites her own

affidavit, wherein she states that Tim Gade confirmed that she had been terminated

for "lack of work", during the processing of the unemployment application. Doc.

#37-3 ¶5.  On this point, the Defendants state that "it is unfortunate that the

report to the Office of Unemployment Compensation reported the separation as due

to lack of work, [but] that report was given by an agent of Gade Nursing Home,

---

[6]Ison's application for unemployment compensation was eventually
approved. Doc. #13 at 9 (Bates #8303).

Inc. who did not speak directly with Tim Gade, the person who was aware of the reasons for [Ison's] termination." Doc. #14 at 22 (Bates #8354). In response, Ison points out that the copy of the unemployment application in the administrative record indicates that a "carbon copy" was sent to Tim Gade. Doc. #34-4 at 2-3.

Ison claims that she first learned of Gade's allegations that she had been terminated for "cause", rather than due to downsizing, when Gade denied her claim for severance benefits. In the letter informing her of the denial, Martha Gade (as the sole member of the Severance Pay Committee) informed Ison that "[she was] terminated for cause due to willful misconduct and insubordination" and that "[she had been] made aware of the reasons for [her] termination at the time of discharge." Doc. #14 at 22 (Bates #8354). In order to get details about the alleged "willful misconduct and insubordination" Gade's attorney sent a letter of inquiry to the Defendants, dated January 24, 2006. Doc. #13 at 8-12 (Bates #8307-#8311). According to Ison, Gade's response to the same came in a telephone conference between Ison, her attorney, Tim Gade and Gade's attorney, on February 16, 2006, during which Tim Gade stated that Ison was fired "because an audit by the Ohio Department of Health had found that by allowing nurses to use 'cheat sheets', [Ison] had caused the nursing home to 'under bill' for services provided for Medicaid and Medicare residents of the nursing home, thereby losing reimbursement to which the nursing home was entitled," and because she was "generally not doing [her] job". Doc. #37-3 (Ison Aff.) ¶ 6; see also Doc. #13 at 3-4 (Bates #8302-#8303).

Ison initiated an investigation into Gade's assertions regarding the Medicaid and Medicare reporting improprieties and discovered that, according to the Medicare web site, there had been no such finding either that Gade was being under-reimbursed, because of the use of the so-called "cheat sheets" or that Gade had lost reimbursement for the same. Doc. #13 at 17-18 (Bates #8316-#8317).  In challenging the denial of her severance pay claim, Ison added a copy of this on-line report to her administrative file, along with documents from her personnel file that had been previously omitted, to include a newspaper article announcing that Gade had selected her as its "employee of the month" for September, 2005 (the month before it terminated her), and copies of her recent, outstanding performance reviews.[7] Doc. #13 at 19-20 (Bates #8318-#8319); Doc. #14 at 6 (Bates #8338).

Gade commenced a review hearing, on May 24, 2006. Doc. #14 at 12 (Bates #8344).  Although Tim Gade was present at the meeting, Ison was not permitted to ask him any questions concerning her termination. Id.  Upon review of her appeal, Tim Gade (as the sole member of the review Committee), informed Ison that the Committee had decided to uphold the decision to deny severance pay benefits. Doc. #9 at 1-3.  In arriving at this decision, the Committee once again concluded that Ison was guilty of "willful misconduct and insubordination" for the

---

[7]In her two annual reviews just prior to her termination (dated March 2004 and March 2005), Ison received the maximum possible numerical score in each of the seven rating categories (e.g., 20 out of 20 possible points in "quality of work") and was given a summary rating of "Outstanding", which was the highest possible rating. Doc. #13 at 19-20 (Bates #8318-#8319).

following reasons:

> Ison has violated Gade Nursing Home policies and Medicare and
> Medicaid requirements by instructing nursing assistants to submit
> incorrect patient information through the use of "cheat sheets," and
> thereby falsifying MDS reports[8] submitted with her certification that
> the information was collected in accordance with applicable Medicare
> and Medicaid requirements.

Id. at 2. In support of their contention about the MDS reports, the Defendants

point to several such, with hand-written annotations showing that there were errors

made when the reports were completed. Doc. #10 at 1-19 (Bates #8224-#8239).

The referenced "cheat sheets" contained previous patient care codes, which

were used to compare the current levels of care being provided to a patient, when

preparing the MDS reports. Doc. #12 at 31 (Bates #8295). In an attempt to

address problems with care providers incorrectly coding patient care, Ison had

instructed the care providers to "check the cheat sheet and compare the answers

to what is currently going on with the resident. If you find the cheat sheet is not

correct, you need to code the tracking form with the correct code and document on

the back of the tracking form the reason for the change." Id. (alterations omitted).

Ison points to documentation showing that these sheets had been used as

---

[8]Medicaid and Medicare regulations establish criteria required for nursing
home resident restorative care programs, including minimum standards necessary
for purposes of Medicaid Reimbursement, which are documented through the use
of Minimum Data Set ("MDS") reports. See Doc. #9 at 9-12 (Bates #8208-#8211).
The "cheat sheets" were used to prepare the MDS reports, on which certain codes
were entered to document patients' health conditions. Doc. #12 at 28 (Bates
#8292). Persons completing MDS reports were required to sign the reports,
certifying the accuracy thereof. See Doc. #10 at 1 (Bates #8224).

far back as 2002. Id. at 32-33 (Bates #8296-#8297). She also alleges that Martha Gade knew of the practice of using these sheets and had even instructed employees to use them. Id. at 28 (Bates #8292). Although the system was modified somewhat after Gade terminated Ison, Gade continued to use the practice of referring to the former patient care codes when filling out current tracking forms. Doc. #37-2 (Williams Aff.) ¶ 3. Ison also points out that the Defendants have identified nothing in the administrative record to indicate that there was a company policy against using such "cheat sheets".

In response, the Defendants put into the administrative record various MDS sheets, which are used for Medicare or Medicaid reimbursement and which contained improper coding; Ison and others had signed these forms, indicating that they were accurate. Doc. #10 at 1-19 (Bates #8224-#8245).[9] The Defendants also allege that, at some point in time, Martha Gade instructed Ison to discontinue using the cheat sheets, but Ison did not stop. Doc. #14 (ltr. to/from Martha Gade) (Bates #8349).

Finally, as to the issue of the reason for Ison's termination, the parties dispute the authenticity of a document entered into the administrative record by the Defendants. The document, entitled "Corrective Action Record", states that Ison was terminated for the following reasons: "MDS submission not on a [timely]

---

[9]Most of these forms contained five signatures, including Ison's. E.g., Doc. #10 at 1, 4 (Bates #8224, #8227). These forms contain hand-written annotations with comments such as "[Ison] took ownership for Sec B by signing above and writing in "B". Id. at 1 (Bates #8224).

basis, validation report reflects out of compliance [sic].  The use of cheat sheets to save time and misrepresent the resident to the State of Ohio." Doc. #12 at 26 (Bates #8290).  The report further indicates that Ison was previously counseled for this misconduct on September 8, September 28 and October 6 (presumably all in 2005). Id.  The form contains four signature lines at the bottom, three of which (for the "Supervisor", "Employee" and "Administrator") are blank. Id.  The only signature contained on the form is that of Tim Gade (signing on behalf of "Human Resource[]s"), with his purportedly signing the form on October 11, 2005 (the date of Ison's termination). Id.

Ison claims that this document was prepared after the fact and was post-dated.  In support, she points to the fact that three of the form's signatures are missing.[10]  She also alleges that she was not provided with a copy of this document until just prior to her meeting with Tim Gade to discuss the appeal of her termination, rather than being provided a copy either on her termination date (the date it was allegedly signed) or as a supportive document for Gade's original decision to deny her severance benefits. Doc. #14 at 10 (Bates #8342).  Ison further asserts that the allegations of misconduct and counseling contained thereon are contrived, because, in accordance with Gade's progressive discipline policy, she should have received a verbal warning, a written warning and then a suspension

---

[10]According to Ison, if an employee refused to sign such a form, company procedure dictated that the supervisor note such refusal on the employee's signature line. Doc. #37-3 (Ison Aff.) ¶ 2.

before she was terminated, none of which happened. Id.; see also Doc. #11 (Gade Employee Policy) 22 (Bates #8261) (noting suggested employee progressive discipline policy). Ison also points to the fact that there was no record of any of the alleged counseling sessions in her personnel files.

In response, the Defendants suggest that the Court previously provided Ison the opportunity to identify documents that she considered to be inauthentic, yet she declined to take advantage of the offer. Doc. #33 at 6.[11]

## 2.    Findings of Fact as to Ison's Termination

Ison urges the Court to find that Gade terminated her due to downsizing and, thus, not "for cause". In support of her contention, she points to her own testimony indicating that Tim Gade told her, on the date of her termination, that she was terminated for downsizing. She also notes that Gade (through its agent) indicated that she was terminated due to "lack of work" on her unemployment compensation application. Ison then states that Gade changed its story when it

---

[11]The Plaintiff previously moved to conduct discovery. Doc. #18. In that Motion, she alleged that the administrative record contained fabricated documents. Id. at 2. The Court overruled that Motion, without prejudice to renewal, after setting forth the following procedures for the parties to follow: (1) Plaintiff's counsel must provide his counterpart with a list of documents that he contends are not authentic and the discovery he seeks as a result; (2) counsel must thereafter meet, in order to attempt to resolve this dispute, and Plaintiff's counsel must share with Defendants' counsel evidence in his possession substantiating his assertion of fabrication, and the latter should share evidence establishing authenticity; and (3) if counsel are not able to resolve the matter, Plaintiff may renew her Motion. Doc. #33 at 6-7.

denied her application for severance pay benefits, claiming that she had been terminated "for cause due to willful misconduct and insubordination", which Tim Gade explained was because of an Ohio Department of Health audit, which had found that her misconduct had caused Gade to suffer reimbursement problems, and also because she was generally not doing her job. Ison then suggests that once she confronted Gade with the Medicaid report, showing that it had not found the indicated problems, and also pointed out her recent, exemplary performance reviews, along with the fact that Gade had selected her as its employee of the month for the month just prior to her termination, Gade once again changed its story. When it reviewed the denial of her appeal, although Gade still claimed that she had been terminated for "willful misconduct and insubordination", it did not mention the audit or her poor work performance, but, instead, said she had violated Gade policies and Medicare/Medicaid requirements, because of her use of cheat sheets and improper coding of MDS forms. As over-arching contentions, Ison asserts that Martha Gade condoned the use of the cheat sheets and, further, she disputes the authenticity of the Corrective Action Record, which Tim Gade purportedly completed on the day he terminated her (pointing to the missing signatures, Gade's failure to provide her a copy of this document until late in the proceedings, and the failure of Gade to follow its progressive discipline policy, as it should have done, if the misconduct and counseling annotated on the Corrective Action Record were, in fact, true).

In response, the Defendants argue that Ison never denied using the cheat

14

sheets and "falsifying" MDS reports.  As to the allegation that Tim Gade post-dated

the Corrective Action Record, the Defendants argue that the Court previously

provided Ison the opportunity to identify documents that she alleged were not

authentic, yet she declined to take advantage of this offer.

Upon review of the facts presented, the Court finds that, even assuming that

Ison directed the use of cheat sheets, in violation of company policy, and that she

also incorrectly completed several MDS reports,[12] the substantial evidence in the

administrative record indicates that Gade did not terminate her for these reasons.

Weighing heavily in favor of the conclusion that Gade, instead, terminated her for

downsizing (and not "for cause") are the following factors:  Ison's testimony about

what Tim Gade told her on the day he terminated her (there is no countervailing

testimony from Tim Gade); the unemployment application form completed by Gade

that stated that Ison had been terminated due to lack of work[13]; Tim Gade's

dishonesty regarding the Medicaid audit conclusions; Gade's selection of Ison as its

employee of the month the month immediately prior to her termination; Gade's

---

[12]The administrative record indicates that Ison played a role in the improper preparation of several MSD reports.  There is nothing in the record, however, to indicate whether this conduct was intentional or negligent.  Thus, the Court refrains from adopting the Defendants' characterization of Ison's conduct as "falsification" of said reports.

[13]In general, a principal will be bound by the acts of its agent. See Master Consol. Corp. v. BancOhio Nat'l Bank, 61 Ohio St. 3d 570, syl., 575 N.E.2d 817 (1991) (noting that principal will be bound by acts of agent, under theory of apparent agency, if principal held out agent as possessing authority in question and person dealing with agent believed agent possessed necessary authority).  The Defendants have offered nothing to indicate that the general rules of agency would not apply, in this case.

recent exemplary performance reviews of Ison; and the lack of disciplinary notations in Ison's personnel records, as would have been recommended by Gade's progressive discipline policy had Ison been guilty of misconduct.

The only evidence offered by the Defendants to substantiate their claim that the October 11, 2005, decision to terminate was based on Ison's alleged misconduct is the disputed Corrective Action Record. As to this document, the Court notes that there is nothing in the administrative record to offset the substantial evidence (e.g., the missing signatures on the form, Gade's failure to provide Ison a copy of this document until late in the proceedings, the failure of Gade to follow its suggested progressive discipline policy, if the misconduct and counseling annotated on the Corrective Action Record were, in fact, true) that indicates that Tim Gade <u>did</u> <u>not</u> prepare this form on the date it was purportedly prepared, October 11, 2005. Further, the Court gives no credence to the Defendants' suggestion that it is precluded from questioning the authenticity of this document, given Ison's failure to follow the procedures that the Court previously outlined. As noted *supra*, the Court's previous ruling on this subject set forth procedures for the parties to follow should Ison decide to renew her Motion to conduct discovery, which she has not done. Since she was under no obligation to follow the outlined procedures in any other event, her failure to do so does not impact the decision on the issues presently before the Court.

II. <u>Legal Standards</u>

A.    Standard of Review

ERISA allows a participant in an employee benefit plan to seek judicial intervention "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  As to the standard of review courts must use when reviewing a plan administrator's decision to deny benefits under a plan, the Supreme Court directs that "[a]ny dispute over the precise terms of the plan is resolved by a court under a *de novo* review standard, unless the terms of the plan 'give the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 210, 124 S. Ct. 2488 (2004) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948 (1989)). Thus, courts must initially determine whether the plan in question gives the administrator discretion to determine eligibility for benefits or to construe the terms of the plan.  If not, the court must conduct a *de novo* review; if so, an arbitrary and capricious standard of review is appropriate. Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006), aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008).  Under either standard, the plaintiff carries the burden of providing evidence sufficient to demonstrate her eligibility for disability benefits. Bauer v. Metro. Life Ins. Co., 397 F. Supp. 2d 856, 864 (E.D. Mich. 2005) (citing Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991)).  The parties, in the present case, agree that the Plan gives the administrator the

discretion to determine benefit eligibility. Thus, the arbitrary and capricious

standard is the appropriate standard of review.

In ascertaining whether a plan administrator acted arbitrarily and capriciously,

the Sixth Circuit instructs that a court must uphold an administrator's decision, "if

it is the result of a deliberate, principled reasoning process and if it is supported by

substantial evidence." Glenn, 461 F.3d at 666 (citations omitted). Stated another

way, "when it is possible to offer a reasoned explanation, based on the evidence,

for a particular outcome, that outcome is not arbitrary or capricious." Williams v.

Int'l Paper Co., 227 F.3d 706, 712 (6th Cir. 2000) (quotation omitted). Despite

this deferential standard, however, a court's review "is no mere formality." Glenn,

461 F.3d at 666 (quotation omitted). "The arbitrary-and-capricious standard . . .

does not require us merely to rubber stamp the administrator's decision." Id.

(quotation omitted).


    B.    Conflict of Interest

If a plan administrator is authorized both to decide whether an employee is

eligible for benefits and to pay those benefits, a conflict of interest exists. Metro.

Life Ins. Co., 128 S. Ct. at 2348. As to the impact of a conflict of interest on the

standard of review in ERISA cases, the Supreme Court instructs that the conflict

does not alter that standard, but "should be weighed as a factor in determining

whether there is an abuse of discretion." Id. at 2350 (quoting Firestone, 489 U.S.

at 115 (internal quotation marks omitted). The Court goes on to explain that the

word "factor" means that "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one" and, in such instances, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." Id. at 2351.

In the present case, the Plan clearly authorizes Gade to both determine whether an employee is eligible for benefits and to pay those benefits.[14] Thus, a conflict of interest exists, which the Court will take into account as a factor in determining whether Gade's decision to deny Ison's LTD claim was arbitrary and capricious.

### C. Further Disposition of Case

If, when applying the arbitrary and capricious standard of review, this Court determines that the administrator's decision was erroneous, it may either reverse and remand the case for further consideration, if Ison's proof is reasonably debatable, or it may reverse and award Ison severance pay benefits, if she is clearly entitled to the same. Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 172 (6th

---

[14]In their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, the Defendants state that "the Severance Plan is funded through a trust, so the Administrator has no financial interest in the payment of benefits." Doc. #46 at 4 (citing the Plan (Doc. #41-2) at 2). This statement makes no sense, however, given the Plan's direction (on the same page cited by the Defendants) that "Gade will deliver its annual contribution(s) under the Plan to the Trustee." Doc. #41-2 at 2.

Cir. 2007).  On this point, the Sixth Circuit notes that "[p]lan administrators should

not be given two bites at the proverbial apple where the claimant is clearly entitled

to . . . benefits.  They need to properly and fairly evaluate the claim the first time

around; otherwise they take the risk of not getting a second chance, except in

cases where the adequacy of claimant's proof is reasonably debatable."  Id.


III.    Conclusions of Law

The Court will now apply the arbitrary and capricious standard of review to

the facts of this case to examine whether Gade's decision to deny Ison severance

pay benefits was the result of a "deliberate, principled reasoning process and . . .

[was] supported by substantial evidence." Glenn, 461 F.3d at 666.  If it is

"possible to offer a reasoned explanation, based on the evidence, for a particular

outcome," the Court will not consider the administrator's decision to be arbitrary or

capricious. Williams, 227 F.3d at 712.  In making this determination, the Court will

take into consideration the conflict of interest that exists with Gade acting in its

role both as decision maker, as to benefit eligibility, and also as payer of those

same benefits.

Ison argues that Gade's decision was arbitrary and capricious, since Gade, in

fact, terminated her for downsizing reasons, as opposed to terminating her "for

cause", as the Defendants claimed.  The Defendants' only argument, on this point,

is that they terminated Ison for using cheat sheets and "falsifying" MDS reports

(e.g., "for cause") and, thus, Gade's decision to terminate Ison because of this

20

misconduct was neither arbitrary nor capricious.

Given the Court's findings of fact that the Plan requires the payment of severance pay benefits to employees who are terminated for downsizing (e.g., for other than "cause") and that Gade terminated Ison for downsizing, the Court concludes that Gade's decision to deny Ison severance pay benefits was <u>not</u> the result of a deliberate, principled reasoning process and was <u>not</u> supported by substantial evidence and was, thus, arbitrary and capricious. The Court further concludes that, since Ison is clearly entitled to the stated benefits, no purpose would be served in remanding the case to the administrator and, thus, the administrator is ordered to award Ison the benefits as provided under the terms of the 1997 Plan.

IV.    <u>Conclusion</u>

Based upon the reasoning and citations of authority set forth above, the Court concludes that the Defendants acted arbitrarily and capriciously when they denied the Plaintiff's claim for severance pay benefits. Accordingly, judgment will be entered in favor of the Plaintiff and against the Defendants, directing Defendants to award Plaintiff severance pay benefits in the amount of $57,058. In addition, the Court orders Defendants to pay Plaintiff pre-judgment interest, from the day following the initial denial of her claim for such benefits, to the date of judgment, and post-judgment interest, from the date of the judgment ordered herein to the date said benefits are paid by the Defendants and received by the Plaintiff. Pre-

judgment interest shall be computed at the prevailing rate and post judgment interest computed at the statutory rate.

The matter of attorney's fees will be dealt with on a post-judgment basis. White v New Hampshire Department of Employment Security, 455 U. S. 445, 102 S. Ct. 1162 (1982) (requests for attorney's fees and costs are routinely addressed in post-judgment proceedings).  Not later than 30 days after the appeal time from this Court's judgment has run or, if appealed, not later than 30 days after the Appellate Court's ruling (should this Court be affirmed), Plaintiff's counsel must submit an itemized statement of fees and costs, setting forth the date and nature of the particular service rendered, the time expended in doing so, and counsel's hourly rate, including therein any fees and costs related to the appeal.  Opposing counsel will then have 20 days in which to respond to the submission of Plaintiff's counsel.  Any attorney's fees granted will bear interest from the date of judgment herein.


The above captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.


August 24, 2009

 /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record